STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ALBERT L. WEINER, DEFENDANT-APPELLANT.

Argued April 23, 1963—Reargued June 3, 1963—
Decided October 21, 1963.

*Mr. Charles A. Cohen* argued the cause for appellant.

*Mr. Norman Heine,* Camden County Prosecutor, argued the cause for respondent.

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant, a licensed physician of this State, was indicted for the involuntary manslaughter of 15 of his patients. He was convicted on 12 counts and acquitted on the other three. He was sentenced to two to four years in the New Jersey State Prison and fined $1,000 on each conviction, the sentences to run concurrently. We certified his appeal before the Appellate Division considered it.

Defendant's specialty is neuropsychiatry. His treatments included intravenous injections of certain drugs and also the infusion intravenously of a saline solution and a surital solution. The State's thesis was that death was caused by serum hepatitis transmitted into the blood stream by these injections and infusions.

The case is unusual. It is unusual in that a physician is charged with crime in pursuing procedures he intended to aid the patient. It is unusual in that there was a common trial

of 15 charges arising out of separate events, and the State's proof included as well evidence of the alleged infection of 25 additional patients who recovered. It is unusual in that the State was unable to prove what precise failure or misconduct transmitted the fatal disease. The issues on this appeal arise from these circumstances, and to see them in perspective, the nature of the disease and the state of medical knowledge must be understood.

Hepatitis is an inflammation of the liver. It may come from sundry causes. Three forms figure largely in this case. One, called "toxic" hepatitis, is caused by certain drugs or chemicals and we gather is noncontagious. The other two, attributed to a virus, are called "viral" hepatitis. One form of viral hepatitis is "infectious" hepatitis and is communicated or transmitted by the fecal-oral route. The other form of viral hepatitis is "serum" hepatitis, and this is transmitted directly into the blood stream by the injection of contaminated material. The State's case depended upon the thesis that the decedents died of serum hepatitis, transmitted into their veins by the injections and infusions which we have already mentioned and which we will shortly describe.

The important fact to be noted is that although infectious hepatitis and serum hepatitis are deemed to be viral, the offending virus or viruses, if there are more than one, have not been isolated and hence have never been cultured. Accordingly there is no way to detect the virus by examination of equipment or drug or solution. Indeed there are carriers of the disease who reveal no evidence of it and who cannot be uncovered by any test. Dr. Hans Popper, produced by the State as a leading authority on diseases of the liver, testified:

"I would like to state that we cannot culture the virus, that is the only way how we can obtain information about—definite information about the existence of virus, is by establishing in a human volunteer that the certain material is infectious. Obviously there are tremendous limitations in doing so. This is the reason for our limited knowledge of viral hepatitis. This is the reason why I am forced to answer many questions I don't know, I don't think so, it may be so."

Dr. Alexander Duncan Langmuir, Chief Epidemiologist of the Communicable Disease Center of the United States Public Health Service, said:

"* * * The infectious hepatitis in the last four or five years has become one where we have become increasingly realizing how important the total problem is. In addition to the routine reports which are put out each week, we put out rather extensive surveillance reports to specialized persons."

Further, even upon pathological examination of the liver tissue it apparently cannot be told whether the hepatitis is infectious or serum. Thus upon autopsy in any given case all that can be said is that the hepatitis is viral in nature. Whether the disease is the infectious type or the serum type can be only inferred from a survey of a much larger scene and by finding in that scene evidence of the known differences between the two viral hepatitises. One such difference is that the rate of fatality is distinctly higher in the case of serum hepatitis. Another is that the incubation period with respect to infectious hepatitis is two to six weeks, while the period in the case of serum hepatitis is six weeks to six months, or, according to some testimony, as much as one year. Here the incidence of viral hepatitis among defendant's patients, when contrasted with the incidence of the disease in the locality, convincingly pointed to defendant's office as the place where the infection was transmitted; and that the hepatitis was serum, rather than infectious, was inferable from the rate of fatality, and also, at least in the view of an epidemiologist produced by the State, from the incubation pattern which he found in the dates of illnesses of the 40 patients to whom we have referred. And of course the circumstances that all of the victims received intravenous injections or infusions supplied the final fact without which the diagnosis of serum hepatitis could not have been made.

The record would well warrant a finding that serum hepatitis was transmitted in defendant's practice. We do not mean that there was no serious issue of fact as to the cause of

death of the 15 patients. There was considerable conflict in
expert evaluation of the post-mortem findings, and the jury
probably acquitted the defendant of three of the charges be-
cause it was not convinced that the deaths therein involved
were due to serum hepatitis.

I.

We of course must keep in mind that this is a criminal case.
In a civil action for damages, the question is whether a loss
shall remain where it fell or be shifted to him whose act
brought it about. The test there is ordinary negligence—the
failure to behave as would a reasonable man in such circum-
stances. The issue being only whether the victim or the actor
shall bear the dollar impact, the law goes far in permitting
the trier of the facts to "infer" both fault and causal connec-
tion between the fault and the loss. Indeed, if the total cir-
cumstances bespeak a likelihood of fault upon the part of a
defendant, the law, for civil purposes, permits a jury to infer
negligence even though the precise respect in which there was
fault cannot be identified. So here, if the suit were for dam-
ages, it could be urged (we of course have no occasion here to
pass upon it) that the total picture breathes the probability
that defendant was careless somewhere and that his unidenti-
fiable carelessness brought about these deaths. And in that
connection, we would not be troubled by the possibility that
one of defendant's nurses may have been the careless actor,
since for the purposes of civil liability, defendant, as the
employer of a nurse, must answer for her fault even though
he was personally blameless.

But a criminal case is another matter. The injury
to be vindicated is not the personal wrong suffered by the
victim but rather an outrage to the State. And the question
is not whether a defendant should absorb the dollar loss of
his victim but whether his conduct justifies stamping him a
criminal and sending him to State Prison. In that inquiry,
the test is not ordinary negligence—behavior of which men of

the highest character are capable. Rather, as phrased in 1 *Warren, Homicide (perm. ed.* 1938), § 86, *p.* 424:

"Negligence, to be criminal, must be reckless and wanton and of such character as shows an utter disregard for the safety of others under circumstances likely to cause death."

See *State v. Williams,* 29 *N. J.* 27, 40 (1959); *State v. Blaine,* 104 *N. J. L.* 325, 327–328 (*E. & A.* 1928). And whereas a doctor is chargeable in a private suit for the negligence of his nurse-employee, he is not chargeable criminally on the basis of *respondeat superior.* 1 *Burdick, Law of Crimes* § 179, *p.* 231; see *State v. Pinto,* 129 *N. J. L.* 255, 257 (*Sup. Ct.* 1942); *State v. Waxman,* 93 *N. J. L.* 27 (*Sup. Ct.* 1919). "For it is of the very essence of our deep-rooted notions of criminal liability that guilt be personal and individual * * *" Sayre, "Criminal Responsibility for Acts of Another," 43 *Harv. L. Rev.* 689, 717 (1930). Accordingly, if defendant is to be criminally liable with respect to an act or omission of his nurse, it could not be merely because he was her employer. He could be so liable only if he directed her conduct or assented to it or failed to act with respect to it in circumstances which indicate the same wantonness or recklessness to which we have referred. And finally, whereas in civil matters the plaintiff need prove his case only by a mere preponderance of the proof, yet in a prosecution for manslaughter based upon criminal negligence the State must prove guilt beyond a reasonable doubt, a test which, despite some theoretical devaluations of it, does serve to tell the trier of the facts that a criminal trial is no guessing game.

## II.

The proof upon the issue of criminal fault revolved about defendant's procedures relating to injections and infusions. To anesthetize the patient, defendant injected either amobarbital or surital into the vein, using the familiar syringe and needle. The infusions were of two kinds. One was of saline

solution, used immediately after an injection of a drug if the drug was found to irritate the vein. The other solution was a dilute mixture of surital and saline, used to maintain a state of anesthesia first achieved by injection of the drug.

The infusion procedure was the same in both cases. To the bottle containing the solution there was attached a plastic tube of some six feet in length, called a Ven-O-Pak. At the other end of the tube was an adapter designed for attachment to the needle after the syringe was detached from it. The adapter came covered with a removable tip to keep it sterile. Before the infusion was begun, the sterile tip was removed and the solution permitted to run through the tube to clear it of air. If this was done by a nurse employed by defendant, the adapter was recapped with the sterile tip, to be removed by defendant when he connected the adapter to the needle. The bottle was hung in a position well above the patient so that the solution could flow by gravity into the vein.

The actual injection and infusion were done by the defendant and not by a nurse. The infusion was preceded by an injection of the drug into the vein, in which process some blood would enter the needle. When the Ven-O-Pak was attached to the needle, some blood was permitted to enter the adapter to indicate that the needle was still in the vein. Thus in every case the needle and the adapter end of the Ven-O-Pak necessarily became contaminated with the patient's blood.

With this description we can relate the sundry theories in the State's case as to how hepatitis, probably brought into defendant's office by some patient, was transmitted into the veins of the 40 alleged victims. We emphasize that there was no direct testimony as to what transpired between defendant and the deceased patients. The State relied primarily upon defendant's records, voluntarily made available to representatives of the State Department of Health, which disclosed treatments of the deceased in which a drug was injected intravenously. Infusions of saline solution were not noted, defendant testifying that they were used only to relieve the vein from drug irritation and that he did not deem them to be

part of his treatment. The State sought to prove that the alleged criminal neglects were matters of general habit or practice, to the end that the jury could infer that defendant subjected each deceased to them.

We will now list the alleged breaches of proper practice all of which the State contended were of criminal proportions, and we will incidentally comment upon the state of some of the proof in the hope that there will be a fuller presentation upon the retrial we feel obliged to order.

(1) Admittedly the 1000 cc. bottles of saline solution and like bottles of surital solution were used on more than one patient. The average infusion ran between 100 cc. and 200 cc. The State contended that although the blood of a patient would enter only the terminal part of the Ven-O-Pak, nonetheless the virus could in some way travel up six feet of tubing and contaminate the contents of the bottle.

There was no testimony as to whether such multiple use of bottles had ever been found to be a medium of communication of this or any disease. Rather the testimony stressed what a particular hospital or an individual doctor did or did not do, which testimony the defense met in kind. It may be that, if fully explored, the practices were less divergent than a mere statement of them would suggest. Some of the testimony was consistent with the thought that where a patient was being treated for a viral hepatitis, everything used upon him was discarded because so little was known about the behavior of the virus. Or it may be that the unused portion of a bottle of an intravenous solution was discarded because what remained was too little for use upon another patient and the economics involved did not justify retaining the unused portion. What impresses us is the categorical testimony of a defense anesthesiologist that multiple use of bottles of anesthetizing solutions administered intravenously was and remains standard practice in surgery.

It seems to us that there need not be so much dispute upon a matter so commonplace, and that there would not be if the testimony were directed to the underlying issue. The testi-

mony should reveal (a) whether the communication of hepatitis by multiple use of bottles of solutions has been demonstrated or is merely feared as a probability or possibility, and if so why; (b) whether the profession generally has been alerted to the alleged danger, to the end that a jury can decide whether defendant knew of it or his ignorance was chargeable to a neglect criminal in nature. As to the second facet, we note that when the State's expert, Dr. Dougherty, the director of the Division of Preventable Diseases of the New Jersey State Department of Health, testified concerning his review with defendant of his procedures, he did not say that multiple use of bottles offended a known established criterion, but rather he said merely that "This multiple use of bottles was a serious problem in my mind." Later, in response to the prosecutor's question, "Well, would you use the same bottle on different patients?" he answered "No, sir." That kind of testimony seems to us to be unnecessarily fuzzy. It should be sharpened to reveal what the profession knew and how widespread that knowledge was at the time of defendant's treatment of the deceased.

We have commented upon the state of the evidence for the purpose of guidance at retrial. So far as the present appeal is concerned, the pertinent fact is that the State's contention that multiple use of these bottles constituted criminal negligence was one of the theses before the jury. We add that the State did not prove that the decedents were in fact subjected to an infusion from a bottle that had been used on a patient who already had the disease.

(2) Next the State contended defendant used the same Ven-O-Pak on more than one patient. It will be recalled the Ven-O-Pak is the tube which conducted the fluid from the bottle to the needle. The tube being plastic, it could not be sterilized for re-use. The defense agreed that a tube must not be re-used because the blood of the first patient would contaminate the adapter and use upon another patient would involve an unnecessary risk of infection. In short, as to this, there was no dispute upon the topic of prudent practice.

Rather the question was whether Ven-O-Paks were re-used. The State offered testimony of former patients or members of their families, most of which was intended circumstantially to indicate such re-use. Defendant and his three nurses (one his wife), all of whom are registered nurses, strongly denied any such thing occurred. In this connection the records of the defendant revealed that during the period here involved, January 1, 1960 to October 25, 1960 when defendant ceased to administer intravenously pursuant to an order of the State Department of Health, he had used 116 bottles of 1,000 cc. and 27 bottles of 250 cc. whereas during that same period 918 Ven-O-Paks were used, 27 with the smaller bottles which bottles were not re-used, leaving 891 Ven-O-Paks which were used with the 116 of the larger bottles for an average of 7.6 Ven-O-Paks per bottle. Those figures, if true, would quite effectively destroy the State's thesis as to Ven-O-Paks since they negate the idea that one Ven-O-Pak was used for each 1,000 cc. bottle. The average of 7.6 per bottle squares with the testimony that the average infusion ran somewhere between 100 cc. and 200 cc. We add that the State did not dispute, at least testimonially, the records concerning purchases or the inventory count which figures in the computation and which was made jointly with a representative of the State Department of Health.

Again, as in the case of the bottles of solution, the State did not prove that the decedents received an infusion after the tubing had been used upon a patient who already had the disease.

(3) Another thesis was that the sterilization procedure was inadequate. Defendant used a dry-heat sterilizer, a product which the record indicates to be standard equipment, reputably manufactured and sold. The syringes and needles, after being immersed in a chemical solution for some period and then rinsed, were placed in the sterilizer which was set for 375° F. and were treated for 15 minutes after that temperature was reached. Sterilization is the immediate task and responsibility of the registered nurse who, according to de-

fense testimony, is trained in that area. This is not to say that a physician has no responsibility to ascertain the sufficiency of the procedures in his office, but rather that the nurse too is apparently expert.

As to this critical aspect of the case, the evidence seems to lack the depth we would think could readily be reached. In the State's case Dr. Popper testified that in his treatise on the liver, published in 1957, he included a short paragraph on the sterilization required with respect to the virus of hepatitis, the contents of which were "taken from the literature, not taken from my own experience." That text recommends autoclaving (a steam process) for 20 minutes at 15 pounds pressure at 121 degrees, boiling in water for at least 10 minutes, or "dry heat at 180 degrees for one hour." Dr. Popper testified he was speaking of centigrade and not Fahrenheit. Translated into Fahrenheit, 180 degrees would equal 356 degrees. Thus an apparent conflict exists between 356° F. for one hour which Dr. Popper had gathered from literature he examined, and 375° F. for 15 minutes which defendant's nurses used.

Defendant and his wife both testified that the figures they followed complied with the directions given by the manufacturer's distributor when they bought the sterilizer. Mrs. Weiner also testified that they coincided with what she had done elsewhere as a registered nurse. Curiously, although the State called the salesman of the distributor to prove the date when defendant purchased an autoclave and the defense brought out from him the standard nature of the dry-heat sterilizer, yet neither side explored the question of manufacturer's instructions as to proper use. We are puzzled, too, as to why the State's witnesses, who are specialists in public health, were not interrogated upon a subject of such obvious significance in the search for the cause of this tragic experience. We should think that authoritative information ought to be available in literature directly connected with the topic of sterilization, and that physicians selecting a sterilization technique would hardly search for an isolated statement in a

book devoted to so specialized a subject as the problems of a single organ of the body. We gather from the testimony that sterilization is taught in nursing schools and in medical schools. If so, there should be available testimony as to what the nursing and medical professions are trained to do.

Again, our comments are for the retrial. For present purposes the pertinent fact is that the jury had before it a disputed claim as to adequacy of the sterilization procedure.

(4) Another possible source was the drug bottle. One former patient testified that on a single occasion defendant, after injecting the needle into her vein, withdrew it, ejected the contents into the sink, and then put the contaminated needle into the drug bottle to refill the syringe. Defendant denied that occurred. The witness did not indicate the size of the drug bottle. Her testimony of course could not establish a habit, but that fact is really of no moment. Its significance on the overall scene is the suggestion that drug bottles could have been the vehicle for dissemination of contaminated material. If, for example, a needle had not been effectively sterilized either because the technique itself was inadequate or because a nurse had failed to follow the established procedures, or a nurse or the defendant had unwittingly contaminated a needle after it was sterilized, the insertion of such a needle into the drug bottle could presumably contaminate the entire contents. In this connection we note that so far as we can find in the testimony, this possible route for spreading the virus seems significant only with respect to surital. As to that drug, the nurses prepared a solution of 200 cc. from which 8 cc. were withdrawn per injection so that a maximum of 25 injections could be made from a single bottle. Some of that solution was also used to prepare a less concentrated solution in 1000 cc. bottles, each of which was used for infusions for an average of seven patients.

(5) There were still other matters referred to in the testimony. The syringes were filled by the nurses and placed in alcohol pads to maintain sterility until defendant was ready to use them. That practice as such was not challenged but the

State did question the length of time which elapsed between preparation and use. At argument, we inquired from the prosecutor whether this was another avenue for the spread of hepatitis, to which he replied that he did not so contend. If that be so, then of course the proof did not belong in the case at all. What the jury understood, we cannot know. Further, there was testimony that on occasions blood was found on furnishings such as a couch. Again we cannot tell whether the State contended, or the jury understood the State contended, that defendant was criminally culpable in that regard and that the spread of the disease was attributable to it.

Another phase of the issue of criminal responsibility is whether defendant was indifferent to warning signs that a viral hepatitis was being transmitted in his practice. In this connection the pattern of the onset of the illnesses is significant.

One patient apparently revealed jaundice on January 15, 1960, and two patients showed jaundice in May. As to them, Dr. Dougherty testified for the State that they "may have been a chance occurrence" which we take to mean that these illnesses could not be said to have been acquired from defendant's practice. Seven patients became ill in July, the illness being fatal as to three. Defendant was acquitted as to two of the three, presumably because the jury found the cause of death was not hepatitis. Defendant testified that when evidence of jaundice appeared in these early cases, his assumption was that the patients had toxic hepatitis caused by certain drugs he prescribed for them, which drugs were known to be hepatotoxic, i. e., capable of causing toxic hepatitis in a limited percentage of users. He testified he took the patients off those drugs and treated them for toxic hepatitis, that he obtained satisfactory results in most cases, and that in the instances in which he did not, he returned the patients to the doctors who had referred them.

A patient became ill on each of the following dates: August 14, September 3, 7, 16 and 21. Of the patients already mentioned, one died on September 7, another September 15,

and another on September 24. Defendant had discussed the cases with other doctors and on September 24, one of them, Dr. Bond, made the first suggestion that these might not be cases of toxic hepatitis. Dr. Bond then recommended that defendant switch to the autoclave instead of dry-heat sterilization and use disposable material whenever possible. Thereupon defendant used only disposable needles and 250 cc. bottles of saline solution so that upon completion of an infusion the needle, tube and bottle were thrown away. The autoclave was purchased and put in use on September 29.

On October 18, by which time additional illnesses had appeared and two more had died, defendant. who had earlier been in touch with the local health officer, telephoned Dr. Dougherty of the State Department of Health and informed him that there was hepatitis in his practice. On October 24 defendant met with Dr. Dougherty, who meanwhile had received word from Pennsylvania of two or three deaths to which we have already referred. On the following day the State Department of Health ordered defendant to cease administering intravenous injections or infusions.

In summary, as one epidemiologist testified, there were two "waves" of the disease. The first was the smaller group in July. The second was the massive outbreak in September, October and November. This pattern may not be too revealing as to when the disease was transmitted. It will be recalled that the period of incubation is six weeks to six months or more, so that the epidemic could be due to some breakdown in defendant's office for a limited period of time or it could be due to some continuous cause or causes.

### III.

With the foregoing in view, we can turn to defendant's complaint that the trial court erred in refusing his motion for a separate trial of each criminal charge. The motion was addressed to the sound discretion of the trial court. *State v. Manney*, 26 *N. J.* 362 (1958). The objective of a com-

mon trial is economy and efficiency for both the prosecution and the defense; the important proviso is that there shall not be prejudice to a defendant's right to a fair trial either by reason of confusion of issues or proof or by reason of a likelihood that multiple charges will prove each other or prove themselves through the sheer weight of numbers.

It seems to us that here the issue does not turn upon the conventional question whether the jury could keep the proofs separate and decide each charge only upon the proof which relates to it. We say this because the State would have to offer the very same proof if but a single count were tried, and if that offer would be proper, as we think it would, then the fact that many charges are being tried together is of no real moment.

The State would have to offer the same proof on the trial of a single count for several reasons. As we have already noted, there was no way to prove that any of the deaths was due to *serum* hepatitis other than by showing the entire scene and drawing the epidemiological inference it would permit. Hence without the proof that a large number of patients were allegedly infected, the State's case would fall. Further, the State was unable to prove precisely what happened between defendant and any decedent and hence had to rely upon proof of habitual practices, to the end that the jury might infer that the same practices were followed in the treatment of the deceased. Hence, realistically the question is not whether there should be 15 trials but whether there may be none at all.

No one who has been on the firing line would minimize the difficulty of defending this doctor against the backdrop of the total tragedy. The single fact of 40 alleged victims, with 15 dead, could readily reverse the presumption of innocence and cast upon defendant the heavy task of proving himself guiltless. Nonetheless, since the alternative is no trial at all, we think the State must be permitted to present its case in the only way that these most unusual circumstances will permit, even though a disclosure of the

dimensions of the misfortune could obfuscate the true issues. But this very hazard and the odds with which it confronts the accused, make it imperative that the courts be meticulous in their demand that the issues be laid out before the jury clearly and sharply, for without such guidance the risk is too great that the verdict will be a response to the tragedy alone and nothing more.

## IV.

The issue which we think was not adequately dealt with is causation. At the close of the State's case the defendant moved for judgment on the ground that, if it is assumed the decedents died of serum hepatitis, still the State had not proved their deaths were causally related to a criminal failure on the part of the defendant. It will be recalled that the State advanced at least four primary theses of how the serum hepatitis was transmitted, but the State could not prove that *any one* of those possibilities was in fact *the* culpable one. The reason, as we have already noted, is that the virus cannot be isolated and hence the infection could not be traced to any of the alleged breaches by defendant of good medical practice.

In fact the State did not attempt to prove causal connection in the conventional way, by expert testimony addressed to that issue. Rather it concentrated its expert testimony upon the question whether the hepatitis was serum rather than infectious or toxic. The State did not ask these witnesses to point to the act or omission of defendant which was the probable cause of the transmission of the disease or to those acts or omissions which together constituted the likely vehicles of that transmission. The witnesses touched the area but incidentally and without this problem in focus. Thus Dr. Dougherty, in explaining why he concluded the deaths were due to serum hepatitis, referred to so much of the hypothetical question as included the testimony concerning re-use of Ven-O-Paks and the testi-

mony that on one occasion after the needle had entered the witness's vein and some blood been withdrawn into the syringe, defendant expelled the contents and re-entered the bottle of medication to refill the syringe. These incidents were described by Dr. Dougherty as involving "a risk of exposure to blood and its products." It may be noted that he made no reference to multiple use of bottles of saline solution or surital-saline solution, nor to the dry-heat sterilizer as used by defendant and his nurses. In fact the hypothetical question made no reference to the sterilization procedure. Dr. Joseph Stokes, Jr., in giving the reasons for his opinion that the deaths were caused by serum hepatitis, referred only to so much of the hypothetical question as revealed "that multiple injections were made from the same bottle; that there were indications of contamination of the tubing." We assume "injections" referred to drugs and hence to contamination of the drug bottles rather than to contamination of the infusion solutions in the bottles. And finally, Dr. W. Paul Havens, in stating why he believed the deaths were due to serum hepatitis, noted that the hypothetical question includes "the history of reception of material that was potentially contaminated," which led to the following question by the prosecutor and answer:

"Q. Doctor, what part of the equipment do you consider to have been contaminated or potentially contaminated?

A. Well, if I interpret correctly the facts in the hypothetical question, it would appear to me that a great many things were potentially contaminated.

The technique as described herein certainly would provide numerous opportunities for contamination not only of tubing, not only of the adapters, of the needles, syringes, furnishings of the office, I would think, since I gather that blood did appear in various places outside of the body."

Thus the State did not try by expert proof to establish a causal connection between the deaths and any specific act or omission. Nor did the State seek by such testimony to identify all the acts or omissions which constitute the likely vehicles or avenues of transmitting the disease. We can but

infer what acts or omissions the State had in mind, and as to this we listed above four such matters and then added a fifth category which the jury may or may not have thought to be pertinent.

If the State had tried this case upon the sole thesis that defendant had subjected the decedents to Ven-O-Pak tubings contaminated with the blood of other patients, the issue of causation would not realistically present any difficulty. The reason is that multiple use of the tubings would so likely spread the disease that, if one found the tubings were so re-used regularly, he would look no further. But the State did not try the case upon that single theme, and for all we can know, the jury may have found for defendant upon that charge. Rather the State advanced the sundry additional theses we described above. It is as to them that we think the problem of causation was not adequately handled.

With respect to such other theses of criminal fault, we could not see how the jury could find from the evidence which of those possible mediums of transmission of the disease (*i. e.,* improper sterilization, multiple use of saline bottles, contamination of drugs) was in fact *the* medium, and upon the reargument we ordered, we understood the State to agree with our view. If there is no way to infer that *any one* of the mentioned mediums for the transmission of the disease did in fact transmit it to the decedents, then it would not be enough for the jury to find defendant was criminally negligent as to but one of the possible mediums the jury found to be established by the proof. Rather, to convict, the jury would have to find defendant was criminally negligent as to *all* of the established mediums, for in no other way could it be said that it was his criminal negligence which caused death. We invited attention to that specific proposition in connection with the reargument. We propounded the question whether, if the jury could not find which of the possible mediums was in fact *the* medium,

"* * * then should the jury have been instructed that the defendant must be acquitted unless the jury found that defendant was

criminally culpable with respect to all of these mediums [of transmission of the disease]?"

In reply the State insisted that a conviction would be proper if the jury found criminal negligence as to *any one* of the vehicles of transmitting the disease. The State argued, by analogy, that if a man were charged with causing death of a pedestrian by criminal negligence in driving a car (a) while drunk, (b) at 70 miles an hour in a 25-mile zone, (c) through a red light, and (d) onto a crosswalk teeming with people, the jury could convict without finding defendant did all of those things. That may be so, but the analogy fails because in the hypothetical case the jury could conclude that the reckless act it found *did in fact cause the death*. In the case before us, it would not be enough to find, for example, that defendant was criminally negligent with respect to multiple use of bottles of solution, because, as the State concedes, there is just no way to say that that act transmitted the virus and brought about the deaths with which defendant is charged. For all that one could tell, the fatal failure, according to the State's own thesis, could have been in the sterilization of needles and syringes, as to which the jury, although accepting the State's claim that the procedure was inadequate, may have found defendant was not negligent or was not criminally negligent. Hence the deaths cannot be attributed criminally to defendant unless he is found to have been criminally culpable as to all the mediums which could have transmitted the virus, *i. e.*, all the mediums projected by the State except such of them as the jury should find the evidence did not establish.

At a retrial, the State should by expert proof direct attention to the acts or omissions which are the probable vehicles for transmitting the disease. In that way defendant will know what to meet and a jury will know the area in which criminal negligence must be found. If the state of medical knowledge does not permit such delineation, that fact should be disclosed to the end that the adequacy of the proof can

be weighed by the court and jury in the discharge of their respective duties.

We add that the trial court should have instructed the jury with respect to defendant's criminal liability for the negligence of his staff. The defense requested instructions upon that topic which, however, were not granted. The trial court mentioned the subject only with respect to Ven-O-Paks, as to which it said:

"The evidence indicated that it was the duty of the nurses employed by the defendant to change the Ven-O-Pak or tube after each infusion. If you conclude from the evidence that the nurses failed to perform this function contrary to the rules of their employment, and you are convinced beyond a reasonable doubt that this fact was known *or should have been known to the accused*, and the failure to do so was a proximate cause of the death of anyone or all of the 15 decedents, then you would be justified in finding the defendant guilty of any or all of the counts of the indictment." (Emphasis added)

The jury returned 40 minutes later with a request of which only the following is revealed:

"In your Honor's charge, specific reference was made regarding a doctor's responsibility and/or liability for over [overt?] acts of commission or omission by nurses in his employ which are the proximate cause of some subsequent wrong."

We do not know what the jury's question was, since the trial court read into the record only the foregoing portion of the jury's communication. The trial court responded, "I am going to read to you that particular paragraph I feel you have reference to, since you refer to my charge." The trial court then repeated the portion of the charge we quoted above, whereupon the defense objected to the charge as to its substantive content and iterated its objection to the court's failure to charge the requests the defense had submitted.

The difficulty with the instruction as given is that it makes defendant culpable with respect to a nurse's failure to perform her duty if her failure *"should* have been known" to him. As we have said, defendant could be liable with respect

to a nurse's act or omission only if he was personally culpable, that is, if he authorized or assented to it or himself was guilty of wanton and reckless indifference with respect to it. It so happens that as to the Ven-O-Paks, the use of "should have been known to the accused" was of no possible harm, since it is clear that defendant *had to know* of a nurse's failure because only he attached the adapter to the needle and in that process he would necessarily know whether the Ven-O-Pak had been used. Nonetheless, while the instruction was harmless as to Ven-O-Paks, there would be no reason apparent to the jury why defendant would not also be criminally liable if some other failure of a nurse (as to sterilization for example) "should have been known" to him. Thus, under the facts of this case, the standard of responsibility, laid down as to a nurse's handling of Ven-O-Paks, would likely be understood by the jury to pervade the entire case and to warrant a conviction even though defendant's failure to know of his nurse's act or omission was not a failure of criminal proportions.

If the jury understood the charge related only to Ven-O-Paks, then the jury was wholly uninstructed upon the question of defendant's responsibility with respect to other acts or omissions of his nurses. As we have said, defendant requested charges upon that subject. The jury's inquiry was not in terms limited to Ven-O-Paks; it spoke of "overt acts of commission or omission by nurses in his employ." The jury should have been suitably instructed, especially since most laymen probably know an employer is civilly liable for his employee's conduct and hence might assume the same or a similar rule applies in criminal matters. We know the jury was interested in the subject, and since the proof could well leave the jury in doubt as to whether a nurse was the one who failed, the jury should have been told what is required to inculpate defendant with respect to such failure.

The judgments of conviction are reversed and the matters remanded for new trial.

HANEMAN, J. (dissenting). As noted in the majority opinion, this is a most unusual case, both because of the nature of the disease and the mode of proving the alleged criminal negligence of defendant.

To keep the issues in proper focus it must be remembered that hepatitis is of two general classes, *i. e.*, (1) toxic hepatitis, and (2) viral hepatitis. Jaundiced or icteric skin is a common characteristic of both classes. Toxic hepatitis is caused by various poisons or drugs and is noncommunicable. Viral hepatitis is caused, as its name suggests, by a virus which has to date not been isolated, and is subdivided into two categories, *i. e.*, (1) infectious, (2) serum hepatitis. Infectious hepatitis, which has an incubation period of four to six weeks, is generally transmitted orally, although it is possible to transmit the disease parenterally. Serum hepatitis, which has an incubation period of from six weeks to eight months, is transmitted *only* by the introduction of the virus into the blood stream. The disease is so virulent that the introduction of 1/40,000 of a c.c. of virus-bearing plasma into the blood is sufficient to cause infection. (A c.c. equals about one-quarter of a teaspoon.)

The determination of whether a patient is suffering from infectious or serum hepatitis is particularly difficult at the onset of the disease. And it must be emphasized that in the early stages of hepatitis no positive diagnosis can be made to eliminate any one of the three types. The positive ascertainment of which of the above types of hepatitis a person is suffering from can be made only through the history of the patient or by epidemiology. That there has been an increase in the recognized incidence of serum hepatitis since World War *II* is a substantiated scientific fact which has received much general publicity. In spite of the minimal information about serum hepatitis it is medically indisputable that the disease is transmitted solely by the introduction of the virus into the blood stream, and that the spread of the infection

during the course of intravenous injections or infusions can be prevented by the use of aseptic instruments and medication.

We come then to the crime for which defendant was indicted in 15 separate counts—involuntary manslaughter in connection with the death of 15 persons, all of whom allegedly died of serum hepatitis with which they became infected as a result of defendant's criminal negligence.

The essential elements which had to be established beyond a reasonable doubt to convict the defendant under any count were as follows: (1) the decedent named in each count of the indictment died of serum hepatitis; (2) this disease was transmitted by defendant during his course of medical treatment; (3) the transmission resulted from the criminal negligence of defendant during the course of that treatment.

As to the 12 of the named decedents of whose deaths defendant was found guilty, the majority agrees that there was sufficient proof to warrant the jury in finding that the first two elements had been established beyond a reasonable doubt. But they are dissatisfied with the way the third element was handled at the trial, in essence concluding that the State failed to establish a standard practice which defendant violated; that even admitting that such a standard and breach had been adequately demonstrated, the State failed to show which one or more of these improper procedures were followed in the treatment of these 12 decedents, thereby failing to adequately prove a causal connection between such alleged criminal negligence and the deaths; and that the trial court should have charged the jury that in order to find defendant guilty of a patient's death it must determine which particular standard or standards the defendant breached, causing death.

Before addressing these conclusions, a discussion of "criminal negligence" is required.

It is difficult, if not well nigh impossible, to give a precise definition of criminal negligence. 1 *Wharton's Criminal Law & Procedure*, 613, 620 (*Anderson* 1957). The cases have referred to it in general terms as "reckless," "gross"

or "wanton." *Wharton's, supra,* 613. *Wharton's, supra,* 611, reads as follows:

"It involves a reckless disregard for human life, and is the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as a result of the willful creation of an unreasonable risk thereof. There must be negligence of a gross and flagrant character, evincing reckless disregard of human life, or the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of conscious indifference to consequences, or which shows such wantonness or recklessness or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them."

In *Staub v. Public Service Railway Co.,* 97 *N. J. L.* 297 (*E. & A.* 1922), the court said, at *p.* 300:

"To establish a willful or wanton injury it is necessary to show that one with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result."

See also *State v. Gooze,* 14 *N. J. Super.* 277 (*App. Div.* 1951), *State v. Diamond,* 16 *N. J. Super.* 26 (*App. Div.* 1951).

The foregoing standards have been stated with more precision where applied to the medical profession. Justice Holmes, in *Commonwealth v. Pierce,* 138 *Mass.* 165, 52 *Am. Rep.* 264 (*Sup. Jud. Ct.* 1884) held that a physician's criminal negligence could be found in his foolhardy presumption or gross negligence in prescribing treatment. That was similar to the condemnation of the "leap in the dark" which defendant herbalist took in *R v. Markuss,* 4 *F. & F.* 356, 176 *Eng. Rep.* 598 (1864). In *State v. Lester,* 127 *Minn.* 282, 149 *N. W.* 297, *L. R. A.* 1915 *D,* 201 (*Sup. Ct.* 1914), defendant's criminal negligence involved his alleged incompetency, inattention, or wanton indifference to his patient's safety in treatment by x-ray.

In *Hampton v. State,* 50 *Fla.* 55, 39 *So.* 421 (*Sup. Ct.* 1905), it was held that criminal negligence exists where the physician or surgeon, or person assuming to act as such, exhibits gross lack of competency, or gross inattention, or criminal indifference to the patient's safety, and that criminal negligence may arise through gross ignorance of the science of medicine or surgery and of the effect of the remedies employed, gross negligence in the application and selection of remedies and lack of proper skill in the use of instruments, or failure to give proper instructions to the patient as to the use of medicines. See generally *Wharton's Criminal Law* (*12th ed.*), § 488, *p.* 717; 1 *Anderson Ed.* (1957), § 294, *p.* 618.

In every case, the question of the degree of negligence, *i. e.,* its grossness, recklessness, or wantonness is a question for the jury which must be satisfied that the negligence or incompetence of the accused showed such disregard for the life and safety of others as to amount to a crime against the State deserving punishment. See *Rex. v. Bateman,* 94 *L. J.* (*KB*) 791, 794; 133 *L. T.* 730 (1925). See generally *Wharton's Criminal Law* (1957), 1 *Anderson ed.* (1957), § 294, *p.* 618.

The standard to which a medical practitioner or specialist is held is summarized in *Wharton's Criminal Law,* 207 (*12th ed.*) as:

"A negligent offense is an offense which ensues from a defective discharge of a duty, which defect could have been avoided by the exercise, by the offender, of that care which is usual, under similar circumstances, with prudent persons of the same class. Negligence is of two kinds: *culpa levis,* which is the lack of the diligence and care usual with good specialists of the particular class under the circumstances; and *culpa lata,* which is the lack of the diligence and care exercised by honest and worthy non-specialists, dealing with similar objects. In criminal cases this distinction operates mainly to determine the degree of evidence required to convict. A non-specialist (*e. g.,* a person not claiming to be a physician or lawyer) cannot be convicted merely on proof of want or failure to apply due qualifications; while a person claiming to be a specialist can be convicted on such proof. * * *"

And so, a physician, having held himself out as having the requisite skill to treat diseases generally, is held to that degree of skill and care in such treatment as the general class of persons engaged in that profession, and belonging to the same school, has or employs. This rule is particularly applicable to a medical specialist who holds himself out as being especially qualified and better qualified than the ordinary general practitioner to treat of certain diseases because of his special education, training, knowledge and skill. He is required to exercise the degree of care and to have the skill which the class of persons similarly engaged in that line of specialized activity exercises and has. This is a greater requirement than that supplied under the "ordinary reasonably prudent man" concept and requires of such a practitioner, when dealing in his speciality, the exercise of a greater degree of care and skill than is required of the average man and even of the average general practitioner. *Coleman v. Wilson*, 85 *N. J. L.* 203 (*E. & A.* 1913), *Carbone v. Warburton*, 22 *N. J. Super.* 5 (*App. Div.* 1952), *aff'd.* 11 *N. J.* 418 (1953); *Clark v. Wichman*, 72 *N. J. Super.* 486 (*App. Div.* 1962).

A medical practitioner, even a specialist, however, cannot be held liable for negligence where he acts as a member of his school of medicine engaged in his speciality might have acted under the circumstances, but injury was caused by error of judgment—a defense not here asserted. 1 *Wharton, Criminal Law*, 618. He is required to employ such care and skill as is ordinarily exercised in his branch of the profession, having due regard to the advanced state and knowledge of the profession at the time of the treatment, and is bound to know the dangers inherent in his method of treatment. *Coleman, Carbone, Clark, supra.*

Applying the foregoing to the factual complex *sub judice,* it becomes apparent that defendant, a specialist in psychiatry regularly employing intravenous injections and infusions as a part of his course of treatment, should have realized the great danger of the transmission of serum hepatitis through

the use of non-aseptic instruments or medication in connection with such injections and infusions, and should have employed all due care to avoid infecting patients.

We turn now to the question of whether the State adequately established both a standard of practice, and defendant's violation of it.

During his injections and infusions, defendant had available two methods of instrument use. He could have (1) employed new disposable needles, syringes, Ven-O-Pak tubing, and bottles of solution in the injection and infusion of each patient and thus have made certain that those instruments or equipment were uncontaminated with the serum hepatitis virus, or (2) used the same needles and syringes repetitively but only after proper sterilization to destroy the virus which possibly could have contaminated the needle and syringe by prior use upon a patient. It is not disputed that the Ven-O-Pak tubing should not be re-used in either method. We shall treat of the repeated use of the 1000 c.c. bottle of saline solution later. The defendant elected to pursue the second of the above alternative courses.

There is adequate expert proof by Dr. Popper, one of the State's experts, that the recognized procedure for the dry heat sterilization of an instrument to eliminate the hepatitis virus was to keep it at 356° Fahrenheit for one hour. Defendant submitted the needles and syringes to dry heat sterilization at 375° Fahrenheit heat for 15 to 20 minutes. He cites as his authority for this course of conduct, directions allegedly given by the manufacturer's distributor of the sterilizing machine which he used. He refers to no scientific authority. Surely, in such a critical area the instructions allegedly received from a nonmedical salesman were not such technical advice as would justify the defendant specialist's reliance thereon nor excuse his apparent failure to make further inquiry or conduct further research to assure himself that his procedure would render the needles and syringes sterile. The only other attempted justification of the sterilization process came from the defendant's wife, who stated

that the temperature and length of time complied with what she had done elsewhere as a registered nurse. Again, this is no basis upon which defendant can rely in support either of the standard nature of the proceeding or the efficiency of the method which he pursued.

There was as well adequate proof that a standard procedure required the use of the Ven-O-Pak tubing for only one patient. Defendant does not dispute this testimony but, to the contrary, admits the necessity of following such procedure.

The proof of the use of 1000 c.c. bottles of saline solution and like bottles of surital solution for from 5 to 10 patients per bottle was as well condemned by some of the State's experts as improper. Some of defendant's witnesses, on the other hand, testified that bottles for intravenous injections or infusions were used repetitively in various institutions. Viewed in the light most favorable to defendant, this raised a fact issue for resolution by the jury.

That defendant appreciated that the testimony concerning sterilization and use of individual bottles for infusions was directed at establishing standards, and that he was not misled by the form in which that evidence was presented, is demonstrated by his contravening evidence on each of these facets of the case.

There is no dispute that the defendant's inserting a needle into the vein of a patient, withdrawing it, emptying its contents into a sink, and then inserting that contaminated needle into a bottle filled with surital would contaminate both the bottle and its contents, and that such a course of conduct would be contrary to accepted practice.

Thus there was evidence of standard practice and of defendant's violation thereof. There was also testimony that would support a finding that these violations amounted to criminal negligence under the circumstances.

But over and above these actions was defendant's conduct in continuing to inject and infuse patients who were jaundiced. Defendant's attention was specifically called by one

patient to the fact that prior to January 1960, and before coming to defendant, she had had a history of hepatitis. A second patient, while being treated by defendant, called his attention to her jaundiced condition in January 1960. Defendant advised her to cease using certain theretofore prescribed drugs but proceeded to treat her intravenously. In May 1960 two patients became jaundiced and were treated for that condition by defendant, who nonetheless continued their intravenous treatments. In July 1960 another patient became jaundiced and defendant continued to treat him intravenously. That defendant recognized the patient's condition as hepatitis is attested by the fact that he so certified to an insurance company. In September 1960 three more of defendant's patients became jaundiced. Defendant told one that he had an inflammation of the liver, the second that he had hepatitis, and the third not to worry. In each of these cases intravenous injections and infusions continued. During this same period defendant similarly treated as many as 20 patients per day.

This conduct must be viewed in the light of the testimony of his own expert on cross-examination that it was not standard practice to continue to inject a jaundiced patient, and that of one of the State's experts that a patient suffering from serum hepatitis should be isolated in a room with his own toilet facilities; food should be served to him upon disposable dishes and with disposable eating utensils; and all equipment used for examination and treatment should not be re-used on another patient. Defendant's conduct must also be considered together with the following circumstances: Defendant ordinarily scheduled patients at 20-minute intervals but on some days he allocated as short a period as five minutes to each patient. He at times treated as many as 40 patients per day. In addition to his wife, who was a registered nurse and who, on occasions, assisted him, he employed two nurses, only one of whom was in attendance at a time. A nurse would be required to function as a receptionist, to make out bills, receive fees and deliver receipts, sterilize equipment, prepare

syringes for use, change the Ven-O-Pak tubes, tidy up the four consultation rooms after each use, administer intramuscular injections and disburse drugs prescribed by defendant. Surely a busy day for each nurse.

The knowledge that one patient had a history of hepatitis prior to January 1960, and that a second became jaundiced in January 1960, should have sounded a tocsin for defendant. This alarm became shriller in May with the two additional cases, still shriller in July with the incidence of another case, and deafening in September with the addition of three more cases. Defendant's disregard of these warnings and his failure to review his procedure—especially since he was assisted by but two nurses and his wife in his practice, which had reached the volume above described—can be categorized as nothing short of reckless or wanton. Not until late in September or early October did defendant change his *modus operandi* by the nonrepetitive use of disposable needles, by the use of smaller bottles of saline solution and surital, and the installation of a steam sterilizer in place of the hot air sterilizer he had theretofore used.

It is only reasonable and logical to deduce that there was something drastically wrong with defendant's procedure when it is realized that serum hepatitis could have been spread by defendant only through the use of contaminated instruments or medication. But defendant, knowing that some of his patients had hepatitis or jaundice in January, May, July and September of 1960, realizing that although he had diagnosed some of their sickness as toxic hepatitis he could not with certainty eliminate the possibility of serum hepatitis, and knowing that serum hepatitis was spread solely by infusion or injection into the blood, continued their intravenous treatments. Thus his conduct in this respect was in breach of standard practice. He also exhibited a general reckless or wanton disregard of and indifference to the welfare of all of his patients when he did not cease intravenous treatment of jaundiced patients and did not check his course of conduct to assure himself that there was nothing in his procedures

which would spread the disease if the icteric conditions he found in some patients were symptomatic of the dreaded serum hepatitis.

From the foregoing it is seen that the State adduced proof which would warrant the jury in finding beyond a reasonable doubt that defendant's course of conduct exhibited a wanton and reckless disregard of the welfare and safety of his patients and the probabilities of fatal consequences of exposing his patients to the known danger of infection with serum hepatitis unless due precautions were taken and standard procedure followed.

My colleagues of the majority also conceive that causation was not adequately proved. They reason that since four or five theses of habitual faults were advanced by the State as constituting criminal negligence, the jury was obliged to find of which one or more defendant was guilty and which one or more was the particular medium that caused the transmission of the disease in each of the deaths.

With this conclusion I do not agree. I reiterate that there was adequate proof, as admitted by the majority, to warrant the jury's finding beyond a reasonable doubt that 12 of the named deceased died of serum hepatitis transmitted by the defendant in the course of his intravenous treatments of them. The only way that serum hepatitis can be communicated is by the introduction of the hepatitis virus into the blood. The disease would not have been spread had defendant's instruments and medication been aseptic. The sole possible conclusion that can be drawn from these postulates is that defendant did not employ sterile instruments or medication. The question which naturally then arises is, What caused the instruments or medication to become and remain contaminated? (*i. e.,* What did defendant do to cause non-asepsis in his treatment of 12 of those who died?)

It must be recognized that direct proof of what actually occurred in the treatment of any of the patients whose fatality was caused by hepatitis is to all intents and purposes impossible. Their respective voices are silenced by death. Thus,

only the defendant and his employees could conceivably furnish this missing information by direct evidence. It is self-evident that the defendant himself could not be called by the State to establish these facts. It is hardly possible that his employees would recall specifically the procedures in each of the 12 instances where death resulted from serum hepatitis, bearing in mind that defendant treated as many as 40 patients per day. Additionally, under defendant's *modus operandi* only he was present with the patient during treatment and hence that which occurred during that period is impossible to reveal. No expert could testify as to the specific negligent act of defendant which transmitted the disease to any individual patient.

It is clear, therefore, that an insurmountable obstacle to prove defendant guilty would be raised were it required to prove what actually transpired in the treatment of each of the 15 patients named in the indictment by pinpointing the particular medium which caused his infection. Were the thesis of the majority followed it would be impossible to convict a defendant who is guilty of more than one negligent act unless the specific act causing the death could be ascertained and proved by direct evidence beyond a reasonable doubt. Circumstantial evidence would be unavailing.

Only by proof of conduct habitually practiced upon those patients who survived the serum hepatitis infection could the State circumstantially demonstrate the possible manner in which both the living and the dead became contaminated. The State, therefore, employed the tactic of attempting to prove that defendant's criminal neglects were matters of general habit or practice and were the cause of the transmittal of the infection to the deceased. In that situation the Prosecutor could not properly have limited the proof to one allegedly improper action. Patently, the State had been advised by its experts that there were at least four or more procedures which defendant pursued which were not consistent with customary practice, and which probably caused the spread of the infection. The State was neither obliged to,

nor could it eliminate any one of the procedures from consideration by the jury.

At no point does defendant assert that having once intravenously treated a patient while infected with viral hepatitis, there was no method by which the further spread of the disease could have been prevented in subsequent like treatments of other patients. He does not argue that it is impossible to destroy the hepatitis virus by instrument sterilization or to prevent the transmittal thereof by the avoidance of equipment re-use. He does not defend upon the thesis that although complying with standard procedure he had committed an error of judgment. No explanation of how 40 of defendant's patients could have contracted serum hepatitis in any method other than through his use of contaminated equipment or medication is advanced. The jury could then have reasonably concluded at the close of the entire case that it was probable (beyond a reasonable doubt) that the disease was spread through his general disregard of standard practice and due care in the above respects to prevent infection and that these derelictions evidenced a reckless disregard of the consequences thereof.

The question here is not simply whether defendant was guilty of a particular single isolated reckless or wanton act of negligence which caused death. I would hesitate to allow a jury to find criminal negligence, under proof of habit and custom, had this case involved the death of a number of patients caused by defendant's single act of negligence on one occasion. (See *Akerele v. The King* (*P. C.* 1943) *A. C.* 255, where the court denied the existence of criminal negligence in the defendant's causing the death of 10 patients by his injections of them from a bottle of fluid that he had mixed in the wrong proportion, defendant's attention not being called to his mistake until the damage had been done.) Here, however, defendant is not charged with an isolated act of negligence but rather with a long, continuous, negligent course of conduct, and the question is whether the aggregate total of defendant's conduct exhibited a general reckless or

wanton disregard and breach of his duty to his patients to exercise that degree of care and skill required of him as a medical specialist to prevent the infection of his patients with serum hepatitis, and, whether it is probable (beyond a reasonable doubt) that the infection was thus transmitted to those for whose death he was indicted as a result of such conduct. Under the proof, the jury was justified in finding that defendant's conduct was such as to exhibit a reckless and wanton disregard of normal procedures. Again, having in mind the nature of the disease, the proof that 12 of the persons who died became infected during Dr. Weiner's course of treatment —a conclusion not denied by the majority—the absence of any proof or argument that these patients could have become infected in any manner other than through some one or more of the State's hypothesized means, it is rational to conclude, beyond a reasonable doubt, that the instruments and medication could have become contaminated only by defendant's deviation from standard practice in one or more of the manners alleged by the State. It is unnecessary under the peculiar facts here present for the jury to decide of which one he was guilty. It was sufficient for the jury to find, as suggested by the State, that there was no other manner in which contamination could have occurred than by some one of the modes followed by the defendant. The jury could also have found beyond a reasonable doubt that defendant's action in continuing intravenous treatments after notice of jaundice in his practice constituted a reckless and wanton disregard of standard practice and his patients' welfare, either by itself or in conjunction with the other improper practices above referred to. It follows that there was adequate proof of criminal negligence to sustain a guilty verdict.

As noted in the majority opinion, the jury requested further instruction in connection with the court's charge. The following appears in the transcript:

"THE COURT: Members of the jury, I have a memorandum from you, in which you say 'In your Honor's charge, specific reference was made regarding a doctor's responsibility and/or liability for over[t]

acts of commission or omission by nurses in his employ which are the proximate cause of some subsequent wrong.'

I am going to read to you that particular paragraph I feel you have reference to, since you refer to my charge.

'(6632) The evidence indicated that it was the duty of the nurses employed by the defendant *to change the Ven-O-Pak or tube after each infusion.* If you conclude from the evidence that the nurses failed to perform *this function* contrary to the rules of their employment, and you are convinced beyond a reasonable doubt *that this fact* was known or should have been known to the accused, and the *failure to do so* was the proximate cause of the death of any one or all of the 15 decedents, then you would be justified in finding the defendant guilty of any or all of the counts in the indictment.'

Is that clear?

All right. You may retire." (Emphasis supplied)

The only reference in the charge to defendant's liability for the acts of his employees was in connection with the re-use of Ven-O-Paks. This is quite clear when the above section of the charge is read in context with the entire original charge. That the instruction was limited to Ven-O-Pak was re-emphasized by the above-quoted colloquy during which that portion of the charge was separately redelivered. I do not see how the jury could have failed to understand that this facet of their instructions applied only to Ven-O-Pak re-use. The propounding of the question by the court, "Is that clear?" and the failure of the jury to demur, leads to but one conclusion, that the jury's request and the court's charge and recharge were understood to have been restricted as above stated and that the jury so "clearly" understood. Moreover, no suggestion appears in the record that the trial court's understanding of what bothered the jury was incorrect, as defendant's counsel made no suggestion or objection.

While on the question of charge, I should like to state that the defendant received a more favorable instruction than the facts and issues warranted, when the court stated:

"It is basic in our thinking that for any criminal liability there must be concurrence of *an evil-meaning mind with an evil-doing hand,* so that to impose criminal liability on any or all of the counts in this indictment, the negligence of the defendant must be such that

you are convinced beyond a reasonable doubt that the negligence was of a gross and flagrant character, evincing reckless disregard of human life, which would raise the presumption of indifference to consequences or which shows a wantonness or recklessness or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of those rights." (Emphasis supplied)

I would affirm.

Justice SCHETTINO joins in the above opinion.

JACOBS, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR and HALL—5.

*For affirmance*—Justices SCHETTINO and HANEMAN—2.