EL PUEBLO DE PUERTO RICO, apelado, *v.* HÉCTOR RIVERA RIVERA, acusado y apelante.

*Número:* CR-88-26 *Resuelto:* 7 de junio de 1989

740

*Héctor Santiago Rivera,* abogado del apelante; *Norma Cotti Cruz, Subprocuradora General,* e *Iván F. Fuster, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Héctor Rivera Rivera fue acusado ante el Tribunal Superior, Sala de San Juan, del delito de homicidio involuntario. Art. 86 del Código Penal, 33 L.P.R.A. sec. 4005. Un Jurado rindió veredicto de culpabilidad y el tribunal lo sentenció a cumplir un (1) año y tres (3) meses sujeto al régimen de sentencia suspendida.

En apelación cuestiona la suficiencia de la prueba y el no haberse brindado cierta instrucción al Jurado. Expongamos los hechos creídos por dicho cuerpo de juzgadores, según surgen de la prueba testifical y documental desfilada.

I

El 15 de mayo de 1986, aproximadamente a las 10:15 A.M., la joven Ana Rosa González Vélez acudió a la farmacia *Family Drug* a comprar el medicamento conocido como *sulfa* para utilizarlo en una erupción que tenía entre los muslos. La cajera, Sra. Carmen Santos, la refirió al recetario. Allí, Ana Rosa le pidió la *sulfa* al apelante Rivera Rivera, práctico de farmacia. Este le preguntó el uso propuesto y ella le explicó. Entonces Rivera Rivera se dirigió al área de la farmacia en que de ordinario se encontraba el polvo *sulfa*, tomó un frasco, extrajo dos (2) cucharaditas que puso en un sobre plástico y lo rotuló "Polvo Sulfa Para Uso Externo". Al hacerlo *no miró la etiqueta del frasco ni se percató de la calavera* y, por ende, de que su contenido era *sulfato de estricnina.*[1]

Acto seguido, lo entregó a Ana Rosa. Ella regresó a su residencia donde su madre, la Sra. Carmen D. Vélez, se lo aplicó en la erupción. Una vez aplicado, Ana Rosa sintió la boca seca, se puso cianótica y comenzó a tener convulsiones. Como a las 10:30 A.M. su madre, acompañada de su otra hija Luz, la llevó al dispensario J.J. Antón en Río Piedras. La atendió el Dr. Orlando Rodríguez Hernández. Ana Rosa llegó muy excitada. La acostaron en una camilla. Debido a que el examen reveló que tenía taquicardia, le hicieron un electrocardiograma. Luego le inyectaron diez (10) miligramos de *Valium.* Se tranquilizó y la mantuvieron bajo observación.

---

[1] Su carácter tóxico y mortalmente peligroso no se discute. A. Goth, *Goth's Medical Pharmacology*, 12da ed., San Luis, Ed. C.V. Mosby Co., 1988, pág. 304.

Después del mediodía, el doctor Rodríguez Hernández autorizó a la señora Vélez a llevarla a la casa. Ana Rosa salió caminando del dispensario. Una vez regresaron, Ana Rosa se acostó en su cama.

Mientras tanto, en la farmacia *Family Drug* —entre las 12:00 A.M. a 12:30 P.M.— su propietario, el Farmacéutico Lcdo. Eloy Ramos, en unión a Rivera Rivera comenzaron a guardar en sus respectivos anaqueles los frascos de medicamentos que estaban sobre el mostrador. En el proceso, el licenciado Ramos cogió un frasco, lo miró e inmediatamente le preguntó a Rivera Rivera: "¿Héctor qué es esto?" Este le indicó que era polvo de sulfa que había despachado por la mañana a una cliente. El licenciado Ramos le señaló que no era sulfa. Rivera Rivera volvió a insistir en su contenido y afirmó que lo acababa de coger de los químicos. Al inquirir del licenciado Ramos, éste le dijo que era *sulfato de estricnina*. Rivera Rivera cuestionó quién lo había puesto allí.

Ante esta situación, el licenciado Ramos ordenó al apelante Rivera Rivera y a la cajera señora Santos que salieran a buscar la cliente. Rivera Rivera trató sin éxito y regresó a la farmacia. Sin embargo, la señora Santos localizó la residencia de Ana Rosa. Llamó varias veces hasta que la señora Vélez la atendió y le manifestó preocupación por el estado de salud de su hija Ana Rosa. Por esta razón no podía acompañarlas y ambas optaron por ir a la farmacia. Allí, el licenciado Ramos habló con la señora Vélez. Le entregó una crema para ponérsela a su hija con la indicación de que le lavara bien el área antes de aplicarla y que, de ser necesario, la llevara a un médico. La señora Vélez le entregó al licenciado Ramos el remanente del polvo y éste le indicó que ya había regañado al muchacho que lo había vendido. La señora Santos, en unión a la señora Vélez, retornaron a la casa. Cuando arribaron Ana Rosa había fallecido.

Como resultado, se practicó la correspondiente investigación. La autopsia reveló que su muerte fue debido a envene-

namiento por *estricnina*. Posteriormente se sometió una denuncia contra Rivera Rivera y contra el licenciado Ramos por asesinato en primer grado. En vista preliminar se desestimó la denuncia contra el licenciado Ramos, pero se determinó causa probable por homicidio involuntario contra Rivera Rivera. Recayó la sentencia que motiva esta apelación.

## II

Analizaremos conjuntamente los dos (2) primeros señalamientos:

> Erró el Tribunal Superior, Sala de San Juan, al declarar culpable al acusado del delito de Homicidio Involuntario, en ausencia de prueba suficiente que justifique o no el fallo emitido.

> Erró el Tribunal de Instancia al evaluar la prueba desfilada y al determinar que la misma es suficiente para vencer la presunción Constitucional de Inocencia. Alegato del apelante, págs. 4–5.

No tiene razón el apelante Rivera Rivera al cuestionar la suficiencia de la prueba para sostener el veredicto de homicidio involuntario. Veamos.

Nuestro Código Penal tipifica este delito en el Art. 86, primer párrafo. Lee:

> Toda persona que *obrando con negligencia* o que al realizar un acto ilegal que no constituyere delito grave, *ocasionara la muerte a otra*, será sancionada con pena de reclusión por un término fijo de un (1) año y ocho (8) meses. (Énfasis suplido.) 33 L.P.R.A. sec. 4005.

Por su parte, el Art. 14 del mismo código reconoce, como forma de culpabilidad, la *negligencia criminal*, que se manifiesta *"por las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona"*. (Énfasis suplido.) 33 L.P.R.A. sec. 3061.

A su vez, el concepto de negligencia criminal lo define el Art. 16 del Código Penal como aquél producto de un acto

"delictuoso *sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley*". (Énfasis suplido.) 33 L.P.R.A. sec. 3063.

▪ Lo expuesto pone de manifiesto que los elementos esenciales del delito de homicidio involuntario, en esta modalidad, son la acción negligente del acto y, como resultado, la muerte de un ser humano. Al respecto, la Prof. Dora Nevares-Muñiz nos ilustra:

> *Muerte Causada por Negligencia.* Bajo esta modalidad del homicidio involuntario los elementos constitutivos son la ocurrencia de una muerte a consecuencia de los actos u omisiones negligentes del sujeto activo.
>
> El Código Penal, ed. 1974, define la negligencia en su artículo 16. Esa definición recoge las distintas modalidades de la culpa típica de la tradición civilista bajo el nombre genérico de negligencia. *Así, la negligencia puertorriqueña con sus modalidades de imprudencia, descuido, impericia, falta de atención, inobservancia de leyes y reglamentos, equivale a la culpa civilista.*
>
> En el contexto del delito de homicidio involuntario, el elemento típico de la negligencia se puede dar de una o varias de las anteriores formas. *Se trata de aquella conducta que se aleja del cuidado, atención, prudencia y pericia, que se espera del hombre prudente y razonable en igualdad de circunstancias.* Además, *el acto puede revestir la forma de una acción o de una omisión.* Véase La Fave & Scott, 591. (Énfasis suplido.) D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, págs. 147–148.

Este ámbito operacional penal cubre al farmacéutico. En lo concerniente a su actividad, Francisco Rico-Pérez expone que su responsabilidad trasciende la civil y disciplinaria, y alcanza la penal. "[E]sta castiga, de modo general, la imprudencia, que comprende la negligencia, *ligereza o irreflexión*, de las cuales se haya producido algún daño, *aunque no haya habido intención maliciosa . . . .*" (Énfasis suplido.) F. Rico-

Pérez, *La Responsabilidad Civil del Farmacéutico*, Madrid, Ed. Trivium, 1984, pág. 35. Dicho autor certeramente señala:

En Derecho Penal se considera como falta el causar un mal a las personas por simple imprudencia o negligencia, y que, si mediare malicia, constituiría delito. *La imprudencia temeraria se caracteriza por la irreflexión, ligereza o negligencia inexcusable, por el olvido de las precauciones que aconseja la más vulgar prudencia* (Sentencias de 15 de octubre de 1931 y 10 de junio de 1936).

La imprudencia punible exige los siguientes requisitos:

1º. Una acción u omisión voluntaria, *no maliciosa*.

2º. Que esta acción haya producido un *mal efectivo y concreto*.

3º. Que este mal hubiera sido *previsible, evitable mediante el empleo de una ordinaria diligencia* (Sentencias de 7 de octubre de 1933, 4 de julio de 1934 y 7 de enero de 1955).

4º. Que esta acción se halle *ligada* por una relación natural de causalidad a un mal efectivo típicamente definido en la ley como delito (Sentencia de 18 de mayo de 1891).

También se comprende en la falta, *la negligencia inexcusable u olvido de ordinarias precauciones que aconseja la más vulgar prudencia para evitar los riesgos que llevan consigo ciertos actos u operaciones del arte* farmacéutico, como: fórmulas magistrales, análisis-clínicos, etc. (Sentencia de 11 de octubre de 1898). (Énfasis suplido.) Rico-Pérez, *op. cit.*, pág. 36.

## III

En el caso de autos están presentes todos los elementos aludidos. Del propio testimonio del apelante Rivera Rivera se desprende el acto negligente que provocó la muerte de Ana Rosa. Rivera Rivera dejó al lado toda su experiencia previamente acumulada al despachar la estricnina de modo inexcusable, observando solamente una simple rutina cuyo único criterio fue la ubicación regular de los medicamentos.

■ Si bien la prueba demostró que el frasco y polvo amarillo de la *estricnina* eran idénticos al de la *sulfa,* aquél

tenía el ominoso símbolo de la *calavera*, que clara y aparentemente anunciaba su contenido *venenoso*. Rivera Rivera admitió que cuando tuvo el frasco en sus manos *no leyó su etiqueta*. Lo elemental de esa sencilla gestión configura y agrava correlativa y proporcionalmente, por omisión, su responsabilidad penal.

Descansó en su ubicación y que el polvo sulfa y la estricnina eran en apariencia idénticos. Precisamente esas características comunes, las cuales Rivera Rivera conocía, exigían un cuidado mayor. Su actuación trascendió los límites de la prudencia mínima que debe acompañar tan delicada tarea. Despachar un medicamento únicamente a base de apariencia similar del envase y de la sustancia, sin constatar su etiqueta, constituye grave negligencia criminal. El alto riesgo que conlleva para la salud humana el despacho de medicamentos exige la adopción de todas las debidas precauciones, entre las cuales se destaca, como medida *inicial* —básica y cautelar— examinar su rotulación. Véase Ley de Reforma Integral de los Servicios de Salud de Puerto Rico, Ley Núm. 11 de 23 de junio de 1976, según enmendada, 24 L.P.R.A. sec. 3001 *et seq.*

## IV

En su alegato, Rivera Rivera invoca a su favor *Pueblo v. Castañón Pérez*, 114 D.P.R. 532 (1983), y *Pueblo v. De Jesús Colón*, 119 D.P.R. 482 (1987). Aduce que la negligencia que da fundamento a una convicción por homicidio involuntario debe reflejar elementos *intencionales*. No estamos de acuerdo. Su contención entremezcla erróneamente uno de los elementos diferenciadores del homicidio involun-

tario y el de mutilación. Según el Art. 96(2) del Código Penal, 33 L.P.R.A. sec. 4033, la mutilación exige los elementos de *ilegalidad* y *malicia*. Este último término (*malicia*) significa "la comisión de un acto dañoso, intencionalmente . . .". Art. 7(19) del Código Penal, 33 L.P.R.A. sec. 3022(19).

En contraste, hemos visto que el homicidio involuntario no requiere la intención como elemento. Precisa negligencia y la muerte de un ser humano. Ello explica por qué en *Pueblo v. De Jesús Colón*, supra, pág. 490, resolvimos que para "configurar el delito de mutilación mientras se conduce un vehículo de motor *tiene que alegarse y probarse que el acto fue intencional. Si la prueba demuestra que el acto fue negligente no procede una convicción por el delito de mutilación*". (Énfasis suplido y escolio omitido.)

## V

Erró el Tribunal de Instancia al negarse a impartir instrucciones al jurado sobre el Artículo 11.020 del Título 26 de LPRA, Código de Seguro, cuando la prueba desfilada y admitida estableció que la Puerto Rico American Insurance había compensado económicamente a los familiares de la persona que resultó muerta en este lamentable incidente. Alegato del apelante, pág. 8.

Rivera Rivera, en lo pertinente —en vista de que la Puerto Rico American Insurance Co., aseguradora de la far-

---

(2) Lee:

"Toda persona que ilegal y maliciosamente privara a otra de un miembro de su cuerpo, o lo mutilare, desfigurare o inutilizare, o le cortare o mutilare la lengua, sacare un ojo, sacare [*sic*] la nariz, oreja o labio, desfigurare su rostro o alterare permanentemente la apariencia de su rostro o inutilizare permanentemente su capacidad para oír, ver o hablar, será sancionada con pena de reclusión por un término fijo de doce (12) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de quince (15) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de ocho (8) años. El tribunal podrá imponer la pena de restitución en adición a la pena de reclusión establecida, o ambas penas." 33 L.P.R.A. sec. 4033.

macia y de su propietario licenciado Ramos, por transacción civil compensó en $70,000 a los familiares de Ana Rosa—pidió la instrucción siguiente:

Dispone el Artículo 11.020 del Código de Seguros de Puerto Rico lo siguiente: "No se asegurará a una persona contra las consecuencias penales de un delito".

La prueba desfilada en este caso justifica esta instrucción. De haber surgido de la investigación realizada por la Compañía aseguradora en este caso que hubo mano criminal en los hechos, dicha Compañía podía y tenía que negar la cubierta de dicha póliza.

 Fundamenta este señalamiento en nuestras decisiones en *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1981), y en *Pagán Caraballo v. Silva, Ortiz*, 122 D.P.R. 105 (1988), expositivas del deber de cubierta y representación legal de una aseguradora en reclamaciones civiles por muerte y aborto. En síntesis aduce que esa compensación era demostrativa de que su negligencia era civil y no criminal, y que según esa tesis el Jurado pudo haberlo absuelto. Tampoco tiene razón.

En primer lugar, por su carácter civil, la jurisprudencia citada no es definitoria de los perfiles de *negligencia* en el delito de homicidio involuntario. Segundo, nuestros pronunciamientos en ambos casos no apoyan su proposición.[3] Y

---

[3] En *Morales Garay v. Roldán Coss*, 110 D.P.R. 701, 707–708 (1981), dijimos que la aseguradora, si bien estaba "excusada de proveer defensa legal por las alegaciones de la demanda *original* en que se imputaba al asegurado haber causado una muerte por asesinato frío y deliberado, *perdió su excusa* una vez *enmendada la demanda* y alegados los hechos de muerte accidental que resultaron finalmente probados en la estimación de la evidencia por el juzgador y que *califican la conducta* del demandado en relación con el causante de los demandantes *como una de negligencia sin intención criminal*".

Posteriormente, en el caso *Pagán Caraballo v. Silva, Ortiz*, 122 D.P.R. 105, 114 (1988), sostuvimos el deber de representación legal ante una demanda por un médico que alegadamente practicó un aborto ilegal a una niña de catorce (14) años a base de que dos (2) años más tarde la demanda también fue enmendada para alegar *que el aborto se practicó negligentemente*.

tercero, la instrucción sobre la defensa consignada en el Art. 11.020 del Código de Seguros, 26 L.P.R.A. sec. 1102, no era pertinente en la presente causa penal. La transacción y compensación que recibieron los familiares de Ana Rosa no era ni podía constituir impedimento para el Estado procesarlo criminalmente. La responsabilidad civil de la farmacia y de su dueño estaba predicada en otra normativa.

Por último, cabe señalar que el Jurado tuvo conocimiento de esa transacción y aun así lo encontró culpable.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Rebollo López emitió opinión concurrente, a la cual se une el Juez Asociado Señor Hernández Denton.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Hernández Denton.

Suscribimos la opinión que hoy emite el Tribunal en el presente caso por cuanto, en primer lugar, estamos convencidos de que el Art. 86 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4005, tipifica como delito la situación de hechos por la cual fue juzgado el apelante, por lo que el mismo constituye "aviso suficiente" a cualquier profesional de la salud[1] sobre la posibilidad de ser encausado criminalmente por el delito de homicidio involuntario en caso de muerte de una persona debido a la *negligencia criminal* de ese profesional de la salud, razón por la cual no se infringe el "principio de legalidad" consagrado en las disposiciones del Art. 8 del referido Código Penal, 33 L.P.R.A. sec. 3031. Véanse: *Pueblo v.*

---

[1] Véase 24 L.P.R.A. sec. 3003(o) y (p).

750

*Tribl. Superior*, 81 D.P.R. 763 (1960); *Pueblo v. Tribunal Superior*, 98 D.P.R. 750 (1970); *Pueblo v. Ríos Nogueras*, 114 D.P.R. 256 (1983); *Connally v. General Const. Co.*, 269 U.S. 385 (1976); *Colten v. Kentucky*, 407 U.S. 104 (1972); *United States v. Harriss*, 347 U.S. 612 (1954); *CSC v. Letter Carriers*, 413 U.S. 548 (1973); R.B. McNamara, *Constitutional Limitations on Criminal Procedure*, Colorado, Ed. McGraw-Hill, 1982, Sec. 1.09; Nota, *Due Process Requirements of Definiteness in Statutes*, 62 Harv. L. Rev. 77 (1948). Endosamos la opinión emitida, en adición, por razón de que entendemos que, *dados los hechos particulares y específicos del mismo*, el resultado al que se llega, y los fundamentos que en apoyo de dicho resultado se aducen, son correctos en derecho.

Ahora bien, sentimos la obligación de expresarnos por separado por razón de que nos preocupa profundamente la interpretación y aplicación que de la opinión emitida pueda hacerse a nivel de instancia en relación con otras situaciones de hecho que conllevan negligencia en que "profesionales de la salud" diariamente se ven implicados. Como resulta obvio, la opinión que hoy se emite "abre las puertas" al encausamiento criminal de profesionales de la salud en relación con la muerte de pacientes alegadamente acaecidas debido a la negligencia de dichos profesionales. Nos preocupa, en particular, que como consecuencia de la decisión emitida se instituya a nivel de instancia la práctica indiscriminada de radicar acusaciones criminales contra profesionales de la salud en situaciones de hecho que no lo ameriten y que dichas acusaciones sean utilizadas como "mecanismo de presión" con el propósito de lograr transacciones en los casos civiles de daños y pèrjuicios. Entendemos procedente exponer y dejar plasmado por escrito nuestra posición y manera de pensar respecto a dicha situación.

# I

El apelante Héctor Rivera Rivera fue declarado culpable de una infracción al citado Art. 86 del vigente Código Penal, *supra*, por el Jurado que intervino, como "juzgador de los hechos", en el proceso que se le celebrara a éste ante el Tribunal Superior de Puerto Rico, Sala de San Juan. Como resultado de ello, dicho foro lo sentenció a cumplir una pena de un (1) año y tres (3) meses bajo el régimen de "sentencia suspendida o libertad a prueba".

Según surge en detalle de la opinión emitida, la referida convicción fue consecuencia de unos hechos ocurridos el día 15 de mayo de 1986. En dicho día el apelante, quien era un "práctico de farmacia", le despachó a la joven Ana González Vélez, en la farmacia en la que él trabajaba, *sulfato de estricnina* en lugar del "polvo de *sulfa*" que ésta le había solicitado en relación con una erupción (*rash*) que ella tenía entre las piernas. Al así despacharlo —conforme ello surge del testimonio que prestara el propio apelante durante el proceso que se celebrara a nivel de instancia—(2) *éste no se fijó en la "carabela* [sic]" que tenía el envase que contenía el sulfato de estricnina,(3) *como tampoco el apelante leyó la información contenida en la etiqueta del referido envase antes de utilizar el mismo*. Luego de que la señorita González Vélez regresara a su hogar y se aplicara en la mencionada erupción el *sulfato de estricnina*, lo cual causó que ésta convulsionara y se pusiera cianótica, la infortunada joven fue llevada a un "dispensario médico" por sus familiares donde fue superficialmente atendida. Con posterioridad a que fuera dada "de alta" del mismo —unas horas más tarde— la joven González Vélez falleció en su hogar. La causa de su muerte fue objeto

---

(2) Véase Exposición Narrativa de la Prueba, págs. 19 y 20, certificada como correcta por el tribunal de instancia.

(3) Conforme requerido por la Ley Núm. 115 de 5 de mayo de 1939, Leyes de Puerto Rico, pág. 601.

de estipulación por las partes a nivel de instancia: *intoxicación por estricnina.*

## II

Conforme dispone, en lo pertinente al caso bajo nuestra consideración, el referido Art. 86 del Código Penal, *supra,* comete el delito de homicidio involuntario toda persona que *"obrando con negligencia* o que al realizar un acto ilegal que no constituyere delito grave, *ocasionara la muerte a otra . . .".* (Énfasis suplido.) No puede perderse de vista, sin embargo, que esa negligencia *es una que debe ser "criminal".* Ello así por cuanto establece el Art. 14 del referido Código Penal, 33 L.P.R.A. sec. 3061, que nadie "podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o *negligencia criminal".* (Énfasis suplido.) *¿En qué consiste o cómo se incurre en esa "negligencia criminal"?* La contestación, en términos generales, a dicha interrogante la encontramos en las disposiciones del Art. 16 del referido Código Penal, 33 L.P.R.A. sec. 3063. Dispone la citada disposición legal que, como regla general, responde por negligencia la persona "que ha producido un resultado delictuoso sin quererlo, *por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley".* (Énfasis suplido.)

Al amparo de las mencionadas disposiciones legales y en vista a los hechos particulares del caso ante nuestra consideración, no albergamos duda de que el apelante efectivamente infringió las disposiciones del citado Art. 86 del Código Penal, *supra;* esto es, que la prueba presentada en el presente caso, dados los hechos específicos del mismo, justifica plenamente el veredicto condenatorio que por el delito de homicidio involuntario rindieron los señores del Jurado. La acción del apelante de despachar lo que le fuera requerido por la joven González Vélez en un lugar —farmacia— donde existen diversos medicamentos *sin tan siquiera mirar la eti-*

*queta del envase* en que se encontraba la sustancia que despachaba, a nuestro entender satisface plenamente el requisito de "negligencia criminal" *en el contexto de los hechos en que se produce su acción.*

Enfatizamos esto último por cuanto es de notarse que la negligencia en que incurre el apelante, un "profesional de la salud", *se relaciona con un acto más bien "mecánico" que ciertamente no requería la evaluación o análisis de unos hechos o situación como tampoco el ejercicio de discreción alguna en el desempeño de la función exigida de él.* Llana y sencillamente le fue solicitado un producto en específico y todo lo que se requería de él era que responsablemente *localizara e indentificara* el mismo dentro de las existentes en la farmacia en que trabajaba y despachara correctamente dicho producto al cliente, lo cual no hizo. Somos del criterio que, al así actuar, el apelante de hecho incurrió en negligencia criminal crasa.

Ello nos lleva a la "razón de ser" de la presente opinión concurrente. Por razón del alto interés público envuelto en esta clase de situaciones, entendemos necesario expresarnos sobre el grado de negligencia que, en nuestra opinión, debe ser requerido por nuestros tribunales en relación con la radicación de cargos criminales, y posterior convicción, por el delito de homicidio involuntario de un profesional de la salud en relación con la muerte de una persona debido a un alegado acto de "mala práctica o impericia" cometido por ese profesional de la salud. Existen tres (3) posibles alternativas o contestaciones a dicha interrogante: (1) la negligencia "civil", esto es, la que "activa" las disposiciones del Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141; (2) la negligencia criminal ordinaria o simple, y (3) la negligencia criminal "crasa". Veamos.

# III

En Puerto Rico, la responsabilidad de un profesional de la salud resultante de la muerte de un paciente alegadamente ocurrida debido a su negligencia tradicionalmente se ha circunscrito *al campo de lo civil*, existiendo abundante casuística al efecto.[4] Esa jurisprudencia sobre daños y perjuicios consistentemente ha requerido *algo más* que el mero "error de juicio o equivocación" de parte del profesional de la salud para responsabilizarlo en la esfera civil.

A esos efectos, en *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 876 (1972), sostuvimos que:

> ... existe *una presunción*, rebatible, en casos de responsabilidad profesional médica, *al efecto de que el médico ha ejercitado un grado razonable de cuidado y de que la administración del tratamiento al paciente ha sido adecuada.* Corresponde al demandante presentar *evidencia suficiente* para controvertir esta presunción y para ello *la prueba debe demostrar algo más que una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional.* Si la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad a éste a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades la causó. *Rivera* v. *E.L.A.*, 99 D.P.R. 890 (1971); *Sáez* v. *Municipio de Ponce*, 84 D.P.R. 535 (1962). El médico debe tener latitud en el ejercicio de un juicio razonable y no es responsable por un error de juicio *a menos que el error sea obvio o sustancial* de acuerdo con la práctica prevaleciente en la comunidad. Si el médico ejerce el cuidado y presta la debida atención al diagnóstico del paciente conforme a la práctica

---

[4] En la esfera penal, la escasa jurisprudencia existente se ha limitado a estudiar la responsabilidad médica que surge como consecuencia de las disposiciones del Art. 91 del vigente Código Penal, 33 L.P.R.A. sec. 4010, el cual prohíbe la práctica del aborto excepto en determinadas circunstancias. Véanse: *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980); *Pueblo v. Najul Bez*, 111 D.P.R. 417 (1981). De hecho, que tengamos conocimiento, nunca se ha radicado un pliego acusatorio contra un médico por el delito de homicidio involuntario en relación con la muerte, por alegada negligencia, de su paciente.

profesionalmente aceptable en la comunidad y actúa de acuerdo con las mismas, no incurre en responsabilidad aunque su diagnóstico constituya un error de juicio. *Rivera* v. *E.L.A.*, supra; *Pérez* v. *E.L.A.*, 95 D.P.R. 745 (1968). (Énfasis suplido.)

Posteriormente, en *Oliveros v. Abréu*, 101 D.P.R. 209, 227 (1973), expresamos:

A tono con nuestro empeño de ser justos y razonables, encontramos necesario decir unas palabras *sobre el margen de discreción profesional que debe tener y tiene el médico al diagnosticar y al tratar pacientes.* Anteriormente nos hemos referido a la medicina como una "ciencia-arte["].] Lo hemos hecho adrede. La práctica de la medicina requiere, en el diagnóstico y en el tratamiento, que el facultativo llegue a juicios y tome decisiones. Hay en ese proceso un inevitable elemento subjetivo. También, la relación de médico y paciente es, o debe ser, única para ambos. . . .

Lo dicho demuestra, por un lado, la responsabilidad que asume el médico al diagnosticar y al tratar y, por otro, *la necesidad de reconocer el elemento humano, subjetivo, no exacto, de su quehacer.* Esa realidad nos lleva, a su vez, a reconocer *que en el ejercicio de la medicina cabe el error de juicio honesto de parte del médico* y aceptable por los tribunales. *Claro, a los tribunales compete ver que la negligencia o la impericia no pase por error de juicio.* Se ha dicho que en el diagnóstico el error de juicio es aceptable como defensa cuando está presente una de las siguientes circunstancias: (1) Cuando existe una duda razonable sobre la condición o enfermedad del paciente; (2) cuando las autoridades médicas reconocidas están divididas en cuanto a cuál debe ser el procedimiento de diagnóstico a seguirse; o (3) cuando el diagnóstico se hace después de un esfuerzo concienzudo del médico para enterarse de los síntomas y de la condición del paciente. (Énfasis en el texto original suprimido y énfasis suplido.)

Recientemente —en *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 303–304 (1988)— expresamos que:

. . . *en el tratamiento de un paciente* el médico posee amplia discreción profesional y que éste no incurre en responsabilidad si el tratamiento que le brinda a su paciente, *aun cuando*

erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica; constituyendo defensa válida para el médico demandado la existencia de divergencia de criterios entre las autoridades médicas sobre si el tratamiento o procedimiento en particular era correcto bajo las circunstancias del caso. . . . *En palabras sencillas, el error de juicio —honesto e informado— cometido por un médico en el tratamiento de su paciente no constituye fuente de responsabilidad.* (Énfasis suplido y en el original.)[5]

Y es que ello no podría ser de otra manera. Tenemos que estar conscientes de que, de ordinario, la conducta profesional de un médico hacia su paciente *no* se limita a llevar a cabo actos "mecánicos o automáticos" como el que fuera requerido del aquí apelante. Por el contrario, la actuación de un médico usualmente es precedida de la evaluación y análisis de unos hechos que lo llevan a tomar una decisión que es producto del ejercicio de su discreción como especialista en una disciplina no exacta como lo es la medicina. Es por ello que ese profesional no debe ser penalizado por un error de juicio.

Establecida *la norma* de que un profesional de la salud únicamente puede ser responsabilizado en el campo de lo civil cuando efectivamente incurre en *conducta negligente*, nos resta contestar la interrogante de si la "negligencia criminal" que exige el citado Art. 14 del Código Penal, *supra*, como requisito para una convicción bajo el Art. 86 de dicho código, *supra*, es la misma que la requerida en la esfera civil o, por el contrario, es una de un "grado mayor".

---

[5] Véanse, en adición, a esos mismos efectos: *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 649 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Lozada v. E.L.A.*, 116 D.P.R. 202 (1985); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Oliveros v. Abréu*, 101 D.P.R. 209 (1973).

## IV

Conforme la doctrina imperante en esta jurisdicción, incurre en "negligencia" que da lugar a la reparación o indemnización del "daño" causado todo aquel que, ante unos hechos o circunstancias particulares, no actúa conforme lo hubiera hecho el "hombre prudente y razonable" o el "buen padre de familia"; esto es, aquel que no actúa conforme la "diligencia media". Según lo expresa Espín Cánovas:(6)

En la culpa extracontractual, sin una regla que marque la debida diligencia, hay que referirse a la conducta *del hombre medio, prudente y diligente*, el *bonus pater familias*, con cuyo patrón abstracto hay que medir toda conducta ilícita y dañosa para poder afirmar si existió culpa en el agente.

El Código español no define la culpa extracontractual, a diferencia de la culpa contractual, pero de modo incidental viene a definirla como la omisión de la diligencia del *bonus pater familias*, al formular una presunción de culpa por los hechos de las personas sometidas a nuestra vigilancia o dependencia. En efecto, dicha responsabilidad cesará cuando las personas encargadas de la vigilancia de otras "prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño" (art. 1.903, ap. último).

Según este criterio la culpa extracontractual consistirá en omitir la diligencia que *el hombre normal* hubiera puesto para evitar el acto dañoso, es decir, el criterio de la culpa *in abstracto*, por contraposición a la culpa *in concreto*, o sea, la que emplearía la misma persona responsable en sus propios actos.

Sin embargo, cabrá tener en cuenta las circunstancias concretas de cada caso, aunque sólo las objetivas, no las subjetivas, pues de otra forma se abandonaría el criterio de la culpa *in abstracto* para caer en el de la culpa *in concreto*.

El profesor Albaladejo,(7) por su parte, nos informa:

El art. 1.902 del C.c. habla de que "intervenga culpa o negligencia", sin especificar más, y lo mismo, la ley 488, 2.º, de la

---

(6) D. Espín Cánovas, *Manual de Derecho Civil Español*, 4ta ed., Madrid, Ed. Rev. Der. Privado, 1975, Vol. III, págs. 470–471.

(7) M. Albaladejo, *Derecho Civil*, 7ma ed., Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, págs. 477–478.

Comp. navarra habla de "negligencia", simplemente; *por ello, según una opinión, alcanza a toda clase de culpa, mayor o menor.* El art. 1.089 del C.c. parece corroborar esta tesis al determinar que nace obligación (de reparar) "de los actos y omisiones ilícitos o en que intervengan *cualquier* género de culpa o negligencia". La responsabilidad por toda clase de culpa, *aun levísima*, se expresa desde antiguo con la regla que dice *"in lege Aquilia* (ley que, como dije, reguló en Roma la culpa extracontractual) *et levissima culpa venit"*.

Esa opinión *de que se responde en cuanto haya culpa por escasa que sea,* encuentra apoyo en algunas sentencias del T.S. Así las de 10 mayo 1963, 25 mayo 1965 y 12 mayo 1969, según las que obligación de reparar nace en todo caso sin que influyan las diferentes graduaciones de la culpa, *puesto que el autor del acto ilícito responde siempre del daño cualquiera que sea el grado de la falta,* como lo revela el art. 1.089, al hablar de "cualquier género de culpa o negligencia". También la de 13 de marzo 1974, que razona lo mismo, y estima expresamente *que hay responsabilidad aun "por una leve omisión de diligencia".*

Según otra opinión, *la culpa extracontractual debe valorarse* (como la contractual) *sobre la base de la diligencia media* (la diligencia de un buen padre de familia): si el agente no llegó a alcanzar ésta, habrá sido culpable (negligente); si la alcanzó, no podrá estimarse que lo haya sido, aunque no hubiese obrado con todo el celo de las personas máximamente diligentes. Esta segunda opinión encuentra apoyo en el art. 1.903, párrafo último, donde se dice que la responsabilidad (si procede) por hecho ajeno "cesará cuando las personas (de que se trate) . . . prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño". Ahora bien, la llamada responsabilidad por actos ajenos, que contempla el art. 1.903, es realmente responsabilidad, no por el acto ajeno, sino por el acto propio de quien, debido a su negligencia, da lugar a que otro cause daño a un tercero. *Luego cabe entender que el que tal artículo exima de responsabilidad si se empleó una diligencia media (la de un buen padre de familia), demuestra que, también en el caso de que se trate de acto dañoso exclusivamente propio, basta, para quedar exento de responsabilidad, el haber observado una diligencia normal.*

De todas formas, contra esta argumentación cabe alegar que quizás requiera ser más estrecha la responsabilidad por actos *exclusivamente* propios; y que tratándose de éstos, la cuestión debe plantearse en los términos siguientes: Desde luego, si el daño se causa por culpa grave, habrá de repararlo el culpable; pero, si la culpa es leve, ¿quién debe soportarlo, el culpable o aquel a quien se irrogó? Planteadas así las cosas, parece justificada la antigua regla *in lege Aquilia et levissima culpa venit; porque es más equitativo que tenga obligación de reparar el que, aunque levemente, fue culpable del daño, que no que haya de soportar éste aquel a quien le fue irrogado.* (Énfasis suplido.)

En resumen, al amparo de las disposiciones del Art. 1802 del Código Civil de Puerto Rico, ante, viene obligado a responder en daños y perjuicios aquella persona que incurre en *cualquier desviación* de esa norma de "prudencia y razonabilidad", como consecuencia de la cual desviación un tercero sufre un daño.

¿Es esa la "negligencia criminal" que exige, como requisito de una convicción, el antes citado Art. 14 del vigente Código Penal de Puerto Rico, *supra*?

Nuestro Código Penal es particularmente deficiente en la regulación de las formas de culpabilidad. El citado Art. 14, *supra*, establece las dos (2) maneras de incurrir en responsabilidad penal: intención y negligencia criminal. Respecto a esta última, el Art. 16, *supra*, sólo se refiere a las formas clásicas de la negligencia y no brinda una definición adecuada de la misma, la cual debería girar sobre el concepto central de previsión o falta de ella.

La doctrina penal constitucional clásica suele distinguir dos (2) tipos de culpa o negligencia:[8] con previsión y sin previsión (con representación y sin representación). En la

---

[8] En lugar de intención y negligencia, que son los términos usualmente utilizados en el derecho anglosajón, en el derecho continental se utilizan los términos de *dolo* (intención) y *culpa* (negligencia).

culpa sin previsión o representación, el sujeto produce un daño (resultado) que pudo y debió ser previsto, pero no fue previsto, apartándose con esta conducta del "estándar" socialmente exigible y exigido. En el caso de la culpa con previsión o representación, el sujeto ha previsto o se ha representado la posibilidad de que el resultado se produzca, pero confía en que no habrá de producirse, confiando en sus habilidades y pericia o en su buena suerte.[9] La esencia de la culpa o negligencia, en fin, está en crear un riesgo irrazonable de que se produzca el resultado delictuoso, ya por falta de previsión o por imprudentemente confiar en que no ha de producirse el mismo.

La discusión en torno a la distinción entre *negligencia civil* (la que basta para responsabilidad civil torticera bajo el Art. 1802 del Código Civil, *supra*) y *negligencia criminal* (la que activa la responsabilidad criminal por negligencia) ha desatado grandes debates. Sin embargo, se estima por la doctrina que la negligencia criminal *es más rigurosa* que la negligencia civil; esto es, que no toda conducta negligente que es suficiente para imponer responsabilidad civil es, sin más, suficiente para imponer responsabilidad criminal. Véanse: R.M. Perkins y R.N. Boyce, *Criminal Law*, 3ra ed., Nueva York, The Foundation Press, 1982, págs. 840–849; W.R. LaFave y A.W. Scott, *Substantive Criminal Law*, 2da ed., Minnesota, Ed. West Publishing Co., 1986, Vol. 2, Secs. 7.12–7.12(a); S. Soler, *Derecho Penal Argentino*, Argentina, Tipográfica Editora Argentina, 1976, Vol. II, págs. 138–142.

Definitivamente somos del criterio que el Código Penal nuestro al calificar la negligencia requerida para una convicción en dicho campo como una de índole "criminal", está re-

---

[9] Estamos conscientes de que dicha situación posiblemente sea la contemplada por el inciso (b) del Art. 15 del vigente Código Penal, 33 L.P.R.A. sec. 3062(b), el cual, debido a una lamentable y desafortunada redacción, la clasifica como conducta "intencional".

quiriendo un *grado mayor o más riguroso* de negligencia; esto es, *no* basta "cualquier desviación de la mediana" para una convicción criminal en nuestra jurisdicción. Como se señalara en *People v. Pociask*, 96 P.2d 788 (Cal. 1939), *criminal significa que es castigable*. No se trata ya de reivindicar un daño sufrido por una víctima o sujeto, sino de un ultraje en contra del Estado; no meramente de si un demandado deberá indemnizar la pérdida sufrida por su víctima en términos de dólares y centavos, sino de si su conducta justifica que se le señale como a un criminal y se le imponga, inclusive, una pena en prisión. *State v. Weiner*, 194 A.2d 467 (N.J. 1963).

Debe quedar claro, sin embargo, que en nuestra jurisdicción ese "grado mayor", o más riguroso, de negligencia que se debe exigir para una convicción por el delito de homicidio involuntario bajo las disposiciones del Art. 86 del Código Penal, *supra, no* significa que el Estado venga en la obligación de demostrar que el imputado de delito incurrió en negligencia criminal *crasa*. Ello *únicamente* resulta necesario en relación con ciertos delitos específicos, como cuando se le imputa a una persona haber infringido las disposiciones del Art. 87 del referido Código, 33 L.P.R.A. sec. 4006.(10) La negligencia criminal "ordinaria" requerida por nuestro ordenamiento jurídico —como, por ejemplo, la exigida por el citado Art. 86 del Código Penal, *supra*— consiste, en realidad, de

---

(10) *"Sec. 4006. Imprudencia crasa o temeraria al conducir vehículo de motor*

"Cuando en la muerte ocasionada por una persona al conducir un vehículo de motor mediare imprudencia crasa o temeraria, se impondrá pena de reclusión por un término fijo de tres (3) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dos (2) años.

"La imprudencia crasa o temeraria es aquella de tal naturaleza que demuestre un absoluto menosprecio de la seguridad de los demás bajo circunstancias que probablemente produzcan daños a éstos y no significa una mera falta de cuidado. Código Penal, 1974, art. 87; Junio 4, 1980, Núm. 101, p. 298, sec. 1."

un *grado intermedio de negligencia* entre la mínima que cumple con lo requerido por el citado Art. 1802 del Código Civil, *supra*, y la negligencia criminal *crasa* exigida en relación con ciertos delitos en particular.

En resumen, la *mera* negligencia o la *simple* desviación de esa conducta "prudente y razonable" del "buen padre de familia", que es fuente suficiente de responsabilidad en el campo civil, *no* constituye base legal para una convicción en el ámbito penal. Ahora bien, la conducta negligente, sin ser crasa, que sobrepasa, o va más allá de, una *mera* desviación de "la mediana" es suficiente para imponer responsabilidad tanto en el campo civil como en el penal.

## V

Exhortamos a los jueces de instancia a no autorizar el encausamiento criminal de profesionales de la salud por el delito de homicidio involuntario en situaciones donde la prueba lo que demuestre sea la comisión de un error de juicio o equivocación de parte del médico en el diagnóstico y tratamiento de su paciente o la *mera* negligencia civil. Permitirlo podría tener consecuencias desastrosas para la calidad de los servicios de salud que se le presta en nuestro país a la cuidadanía en general. En primer lugar, un profesional de la salud, sobre el cual gravita constantemente la amenaza de una acusación criminal y la posible reclusión en una institución penal, probablemente estaría imposibilitado mentalmente de prestar servicios médicos de calidad. En segundo lugar, dicha "amenaza" agravaría aún más la llamada "práctica defensiva" de la medicina por parte de los facultativos médicos con el consiguiente encarecimiento de los servicios médicos en Puerto Rico. Por último, y como expresáramos al principio, la radicación de cargos criminales podría indebidamente utilizarse como medida coercitiva en la consecución de transacciones en los casos civiles de daños y perjuicios por alegada "mala práctica" de la medicina.

En fin, nuestros tribunales de instancia, en beneficio de la cuidadanía en general, deberán velar por que en los casos criminales de esta naturaleza que sean sometidos ante su consideración efectivamente exista prueba clara e indiscutible de *negligencia criminal* por parte de los profesionales de la salud.